## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

ROBINSON BROTHERS PORK, LLC, an
Oklahoma limited liability company, SOONER
PORK LLC, an Oklahoma limited liability          Case No.
company, and ROBINSON FAMILY FARMS,              Hon.
LLC, an Oklahoma limited liability company,

                    Plaintiffs,

v.

BIG DUTCHMAN, INC., a Michigan
corporation,

                    Defendant.
_____/

BODMAN PLC
By:     Dennis J. Levasseur (P39778)
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
(313) 259-7777
dlevasseur@bodmanlaw.com
Attorneys for Plaintiffs
_____/

## PLAINTIFFS' COMPLAINT

June 7, 2018
Detroit, Michigan

Plaintiffs Robinson Brothers Pork, LLC, Sooner Pork, LLC, and Robinson Family Farms, LLC, by their attorneys, Bodman PLC, for their complaint against Big Dutchman, Inc., state as follows:

## PARTIES

1.      Plaintiff Robinson Brothers Pork, LLC ("Robinson Brothers") is an Oklahoma limited liability company with its principal place of business located in Holdenville, Oklahoma. Each of plaintiff Robinson Brothers' members is a citizen of Oklahoma.

2.      Plaintiff Sooner Pork, LLC ("Sooner Pork") is an Oklahoma limited liability company with its principal place of business located in Holdenville, Oklahoma.  Each of plaintiff Sooner Pork's members is a citizen of Oklahoma.

3.      Plaintiff Robinson Family Farms ("Robinson Family") is an Oklahoma limited liability company with its principal place of business located in Holdenville, Oklahoma.  Each of plaintiff Robinson Family's members is a citizen of Oklahoma.

4.      Plaintiffs Robinson Brothers, Sooner Pork, and Robinson Family are collectively referred to in this complaint as the "Robinson Family Entities."

5.      Defendant Big Dutchman, Inc. ("BDI") is a Michigan corporation organized under the state of Michigan with its principal place of business located at 3900 John F. Donnelly Drive, Holland, Michigan 49424.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the matter under 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Detroit_15425200_3

7.      Venue is proper in this district under 28 U.S.C. §1391 because defendant Big Dutchman is incorporated in Michigan and has its principal place of business in the Western District of Michigan.

8.      This Court has personal jurisdiction over defendant BDI because defendant BDI is incorporated in Michigan and has its principal place of business in Michigan.

## COMMON ALLEGATIONS

### A.      The Plaintiffs.

9.      Plaintiffs are owned by Richard and Eddie Robinson and have been in the hog raising business since 1998. Since their modest beginnings, plaintiffs have grown to be one of the largest hog raising operations in the state of Oklahoma.

10.     Plaintiffs own all facilities necessary to raise hogs, including the necessary land, buildings, and machinery.

11.     Plaintiffs, collectively, own four separate hog farms all of which are located in Oklahoma.

12.     In particular, plaintiff Robinson Brothers owns and operates what is referred to as the Home Farm and the Tree Farm.  Plaintiff Sooner Pork owns and operates what is referred to as the Sooner Farm.  Plaintiff Robinson Family Farms owns and operates what is referred to as the Robinson Family Abney Farm.

13.     Since 1998, plaintiffs have been under contract with Tyson Foods ("Tyson"), one of the world's largest producers of pork products, to raise hogs.

14.     Pursuant to plaintiffs' contracts with Tyson, Tyson supplies plaintiffs' farms with gilts (young sows) for breeding.  Tyson also owns the male hogs (or boars) used for insemination purposes.

15.     Tyson also supplies plaintiffs with feed and medicines for the hogs.

3

16.     Plaintiffs breed the gilts and sows then moves them into gestation stalls where they are kept for 42 to 45 days until it is determined that they are pregnant and are moved to an EFS gestation pen with other pregnant sows.

17.     After 112 to 114 days, the group is moved to a lactation barn where they farrow (or give birth to piglets).  A successful farrowing will result in an average of 12 to 14 piglets born alive.

18.     The piglets are then marked with tattoos for traceability.

19.     At approximately 21 days, the piglets are weaned from the sow and then shipped to finishing facilities in Iowa where they are raised.

20.     After the sow is weaned, she is bred back within four to seven days.  Replacement gilts are used to fill spaces left by the culling of unproductive sows.

21.     Plaintiffs are paid by Tyson based on the number of weaned pigs that are shipped each month.

22.     At plaintiff Sooner Pork's facilities, the gilt wean pigs are kept in the Tyson system for replacement gilts for the Oklahoma region for all commercial hog farms and plaintiff Sooner Pork is paid a flat base rate and, at the end of each quarter, a $30,000 bonus if certain rates are maintained.

23.     Tyson has required plaintiffs (and all other of its hog farms under contract) to adhere to very stringent animal welfare requirements so that hogs are no longer confined to crates and each hog receives uniform amounts of feed.

24.     Tyson regularly audits the Robinson Family Entities hog farms for compliance with its animal welfare rules and requirements.

25.     Hog farms that do not satisfy Tyson's requirements are subject to various penalties up to and including loss of quarterly bonuses (for plaintiff Sooner Park) and termination of their contracts with Tyson.

**B.      Defendant BDI.**

26.     Defendant BDI is in the business of designing, manufacturing, and selling poultry and swine production equipment in the United States and abroad.

27.     Defendant BDI touts itself as the leader in the design and production of poultry and swine production equipment.

28.     Defendant BDI claims, among other things, that it:

> "* * * stands for long-lasting quality, service, and unsurpassed know-how, and as the industry leader, our innovations will continue to positively impact the industries we serve. Every day farmers the world over realize the benefits of Big Dutchman's dedication to innovation. From our poultry, pig and egg production systems, to our tightly integrated automatic controls we continue to set standards for efficiency, productivity and reliability."

**C.      Defendant BDI's Callmatic 2 EFS System.**

29.     Among the swine production equipment that defendant Big Dutchman sells (and has since, upon information and belief, 2009) is the Callmatic 2 Electronic Feeding System ("EFS") that defendant BDI claims "is the best alternative to keeping sows in conventional gestation crates * * *."

> "Big Dutchman's electronic feeding system Callmatic 2 is the most advanced feeding system for sows kept in groups (pen gestation) as opposed to gestation crates. It not only allows group housing but **at the same time provides true individual animal nutrition**." Emphasis added.

5

30.     Group housing (as opposed to confinement in gestation crates) allows sows freedom of movement, social interaction and much more comfort thereby complying with animal welfare requirements which is critical to increased swine health and robustness.

31.     Each of defendant BDI's EFS system incorporates a light barrier that allows a sow to enter the feeding station and shut behind her automatically.

32.     Each sow is identified at the feeding system through a RFID ear tag that communicates electronically with an antenna on the EFS (or Electronic Feeding System).

33.     If the sow is entitled to feed, a flap covering the trough opens and feed is dispensed into the trough until the sow has eaten its total ration.

34.     If the sow is not entitled to feed (because she has already eaten her complete ration), the trough flap stays shut and the entrance door is reopened thereby allowing the next sow to enter.

35.     Each of BDI's EFS is equipped with a wire and antenna that remotely connects the RFID ear tag on the sows.

36.     Prior to 2014, the Robinson Family Entities (in particular, plaintiff Sooner Pork) used a prior model of defendant BDI's feeding system that used a single antenna and a different style light barrier system.

37.     Defendant BDI promoted the EFS System to plaintiffs as being a far more efficient feeding system that would allow plaintiffs to comply with Tyson's animal welfare requirements of which BDI was aware.

38.     With regard to plaintiff Sooner Pork, defendant BDI sold it an upgrade to the existing Big Dutchman feeding system which upgrade included the electronics (including modems and antennas) to connect with the RFID ear tag attached to the sows.

Detroit_15425200_3

39.     Plaintiffs continued with purchasing upgrades for the feeding systems at plaintiff Robinson Family Farms' Abney farm location and complete Callmatic 2 EFS's at plaintiff Robinson Brothers' Home and Tree farms.

40.     All such purchases were made in mid-2014 and the Callmatic 2 EFS were delivered and installed in mid-2014.

41.     Almost immediately after installation, the Callmatic 2 EFS began to fail.

42.     In particular, the antennas and associated circuit boards would regularly short out and stop working.

43.     Plaintiffs immediately notified defendant Big Dutchman of the defects and defendant BDI, in recognition of the defects, would send replacement antennas and related equipment for replacement.

44.     Not only did the failure of the Callmatic EFS cause service disruptions to plaintiffs' operations (and compliance with Tyson's requirements) but plaintiffs experienced serious delays in receiving replacement parts due to the fact that defendant BDI purportedly manufacturers those parts in Germany.

45.     Despite repeated attempts to get defendant Big Dutchman to remedy the defects and associated delays (including providing new antennas from 2015 to the present), defendant BDI has breached its express warranty and has failed to provide plaintiffs with merchantable products that are fit for their intended purposes.

46.     Not only did plaintiffs experience significantly reduced yields (thereby lowering the amount of compensation they would receive from Tyson), plaintiff Sooner Pork failed to receive the quarterly bonuses from Tyson due to the defective Callmatic 2 EFSs.

Detroit_15425200_3

## COUNT I
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

47.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 46 of this complaint.

48.     Furthermore, the Robinson Family Entities were forced to incur considerable expense in replacing defendant BDI's EFSs after providing defendant BDI with a reasonable amount of time to remedy the defects.

49.     To the extent required by law, the Robinson Family Entities have given notice of this rejection of defendant BDI's Callmatic 2 EFSs.

## COUNT I
## BREACH OF EXPRESS WARRANTY

50.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 49 of this complaint.

51.     Under both Oklahoma and Michigan law, an express warranty by a seller such as BDI is created by:

- An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the business of the bargain that the goods will conform to the affirmation or promise; and/or

- A description of the goods which is made part of the basis of the bargain that the goods shall conform to the description. See, M.C.L.A. 440.2313; U.S. §12A-2-313.

52.     An express warranty was created by ABDI by its affirmation and promise to the Robinson Family Entities that the Callmatic 2 EFSs would operate in a manner that was connected by and otherwise compiled with Tyson's requirements.

Detroit_15425200_3

53.     Furthermore, an express warranty was created by defendant BDI by its description of the Callmatic 2 EFSs that those products will conform to defendant BDI's description; that is a swine feeding system that satisfied Tyson's requirements.

54.     As demonstrated above, defendant BDI breached its express warranties.

55.     As a direct and proximate result of defendant BDI's breach of the foresaid express warranty, plaintiffs have suffered damages and losses in an amount in excess of $75,000, exclusive of interest and costs.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

56.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 55 of this Complaint.

57.     Each contract for the sale of goods is covered by an implied warranty of merchantability.

58.     Section 2314 of Michigan's UCC provides, in relevant part, that:

"(1) * * * a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * *

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

* * *

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; * * *

9

(3) Unless excluded or modified (section 2316) other implied warranties may arise from the course of dealing or usage of trade." M.C.L.A. §440.2314."

59.     Oklahoma's Uniform Commercial Code provides identical language.  See, O.S. §12A-2-313.

60.     At all relevant times, defendant BDI implied, promised, contracted and warranted that the Callmatic 2 EFSs, including all related components and parts, would be merchantable quality and free of defects.

61.     As demonstrated above, the repeated failures of defendant Big Dutchman's Callmatic 2 EFSs was caused and resulted from the breach by defendant BDI, by and through its agents, servants, subagents, employees, and/or representatives.

62.     As a direct and proximate result of defendant BDI's breach of the aforesaid implied warranty, plaintiffs have suffered damages and losses in an amount in excess of $75,000, exclusive of interest and costs.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF FITNESS**

63.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 62 of this complaint.

64.     Each contract of the sale of goods is covered by an implied warranty of fitness for their ordinary, intended and foreseeable purposes and uses.

65.     Section 2315 of Michigan's UCC provides that there is an implied warranty that goods shall be fit for such purpose.  M.C.L.A. §440.2315.  It reads as follows:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section of an implied warranty that the goods shall be fit for such purpose."  M.C.L.A. §440.2315.

Detroit_15425200_3

66.     Oklahoma's Uniform Commercial Code contains identical language.  See, O.S. §12A-2-315.

67.     At all relevant times, defendant BDI impliedly promised, covenanted, and warranted that the Callmatic 2 EFSs, including all related components and parts, would be fit for their ordinary, intended and foreseeable purposes and uses.

68.     The repeated failure of the Callmatic 2 EFSs was caused by and resulted from the breach of defendant BDI, by and through its agents, subagents, servants, employees and/or representatives, of the implied warranty of fitness.

69.     As a direct and proximate result of defendant BDI's breach of the aforesaid implied warranty, plaintiffs have suffered damages and loss in an amount in excess of $75,000 exclusive of interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands a judgment against defendant Big Dutchman in an amount in excess of $75,000.

Respectfully submitted,

BODMAN PLC

By:      /s/ Dennis J. Levasseur
         Dennis J. Levasseur (P39778)
         1901 St. Antoine Street
6th Floor at Ford Field
Detroit, Michigan 48226
dlevasseur@bodmanlaw.com
(313) 259-7777
Attorney for Plaintiffs

June 7, 2018
Detroit, Michigan

11

Detroit_15425200_3